IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNUSSUN GADSDEN,<br><br>    Petitioner,<br><br>  vs.<br><br>D. K. SISTO, Warden,<br><br>    Respondent. | No. C 06-06408 JW (PR)<br><br>ORDER DENYING PETITION FOR<br>A WRIT OF HABEAS CORPUS |

Petitioner, a California state prisoner currently incarcerated at the Solano State Prison, has filed a pro se petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. The Court reviewed the petition and ordered respondent to show cause why a writ of habeas corpus should not be granted based on petitioner's four claims. Respondent has filed an answer, along with a supporting memorandum and exhibits. Petitioner did not file a traverse.

**BACKGROUND**

According to the petition, petitioner was convicted by a jury in Superior Court for the State of California in and for the County of Santa Clara of kidnapping for robbery, second degree robbery, carjacking, making criminal threats, and

Order Denying Petition for a Writ of Habeas Corpus
P:\PRO-SE\SJ.JW\HC.06\Gadsden06408_denyHC.wpd

criminal flight. Petitioner was sentenced to a term of seven years to life in state prison. The California Court of Appeal affirmed, and the Supreme Court of California denied a petition for review. Thereafter, petitioner filed unsuccessful habeas petitions in all three levels of the California courts.

The California Court of Appeal set forth the following summary of facts:

> Jesus Solorio was 21 years old at the time of his September 2002 trial testimony, and lived in Hollister. His family owned a white 1995 Toyota Corolla in June 2001. He paid for the installation of three televisions, a PlayStation, a Pioneer stereo, and 12-inch speakers in the car. One television was in the front on the dash, and the other two were on the back of the front seats of the car. The PlayStation was kept underneath the front passenger's seat, and could be used with any of the three televisions. The speakers were in the trunk.
>
> The night of June 17, 2001, Solorio drove the car to the Club Tropicana in San Jose with four female friends. He parked in a lot about one block away. The all got out and walked towards the club. Although the women went inside, he went back to his car because he forgot his wallet. Other people were scattered around the parking lot when he searched his car and found his wallet under a seat. Two men that Solorio identified at trial as defendants White and [petitioner] walked towards the car and White said, "'That's a nice car.'" Solorio stayed by his car and talked to defendants. They asked him about the items he had in the car as he was sitting in the driver's seat making sure that he had secured everything. White opened the front passenger door and sat down inside. [Petitioner] got in behind him and said that he wanted to play the PlayStation. Solorio allowed [petitioner] to play the PlayStation for four or five minutes.
>
> Other people were around another car showing off its hydraulics in the parking lot. A policeman drove into the lot and told everyone to leave, that they could not stay there. White pointed a gun with a long barrel that was tucked in his shirt at Solorio and said, "Drive." Solorio took off and drove defendants at White's direction because he was afraid. During the drive defendants talked about where they should take Solorio and about what they wanted out of the car. White wanted the television and [petitioner] wanted the PlayStation.
>
> After about ten minutes they arrived at some apartments on a dead-end street. Solorio stopped the car and defendants started to strip it. White attempted to take the television out of the dash and [petitioner] took out the PlayStation. They discussed who was going to keep the stereo parts; White wanted the equalizer and [petitioner] wanted the amp and speakers. White told Solorio to take everything out of his pockets, so Solorio got out of the car and gave White his wallet. White opened the wallet and said, "'If anything happens, I know where you live.'" [Petitioner] then told Solorio to get down on his knees. [Petitioner] pointed a gun at Solorio while White struggled to get the television out of the dash. After a minute or two, White told Solorio to get back in the car.
>
> White gave directions to Solorio to drive to an alley and stop there. It was dark but Solorio could see that they were at an apartment

complex. Cars were parked and there was a dumpster. Solorio asked to be let go, but White hit him with his fist and said, "'Be quiet.'" White told Solorio to get out of the car and said that if he did anything, "'I'm going to kill you.'" Solorio did not run because White was still pointing a gun at him. He went around the front of the car and stood by the back passenger side door. The car door was open and Solorio could see [petitioner] ripping the equalizer's wiring out while White took the stereo out of the dashboard. White put the removed items, including the speakers from the trunk, in a multicolored blanket in the back seat of Solorio's car, and then put everything in a shopping cart.

White told [petitioner] that they should take Solorio somewhere, but [petitioner] told him to forget it, that Solorio would not say anything, and to let him go. [Petitioner] told Solorio to stay there until White returned. White left with the shopping cart, saying that they should put Solorio in the trunk, kill him, and throw him in the river. [Petitioner] ordered Solorio, at gunpoint, to get into the trunk of the car, so he did. [Petitioner] attempted to close the trunk lid two or three times, but Solorio stuck a tire iron out to prevent it from closing. When [petitioner] opened the trunk lid to see what was going on, Solorio hit him in the stomach with the tire iron. [Petitioner] went down. Solorio climbed out of the trunk and ran the opposite direction from where White had gone. While he was running, he heard a gunshot behind him. He kept running, jumped a fence at a school, and then jumped another fence. A man he met took him to a police officer.

The officer drove Solorio back to where his car had been, but it was not there. He reported his car, television, stereo, speakers, amp, equalizer, cell phone, wallet, and PlayStation missing. He said that White was wearing an athletic jacket, [petitioner] was wearing a bandana, and they both were wearing fishing hats. He suffered bruises from where White hit him.

Detective Anthony Mata was assigned Solorio's case on June 19, 2001. He spoke with Solorio that day at the police department, and did not observe any physical injuries. He made a list of the property that was reported missing and checked Solorio's cell phone records. He then asked other officers for assistance with a parole search for an individual (not either of the defendants) at a Fallingtree Drive residence in San Jose.

Sergeant Robert St. Amour, Officer Manuel Guerrero, Detective David Gutierrez, and Detective Paul Joseph assisted Detective Mata with the parole search at the Fallingtree Drive residence at 10:45 a.m. on June 22, 2001. While waiting to do the search, Detective Mata heard a radio broadcast that officers conducting surveillance had observed Solorio's car pull up to the residence. Somebody left the residence and entered the car, and the car then drove away. Guerrero saw Solorio's car leave the residence and attempted to initiate a vehicle stop of the car by activating his patrol car's emergency lighting. The car did not pull over, so Officer Guerrero activated his siren. The car still did not pull over, but continued on to an onramp to northbound I-680. There it came to a slow roll and both the driver's door and passenger's door swung open. The two occupants exited the car and ran. Officer Guerrero started chasing them on foot, but they disappeared into a wooded area. Officer Guerrero broadcast the description of the two suspects.

Sergeant St. Amour saw a young male who matched the description of one of the suspects. The man was wearing a blue shirt

and a white tee shirt. Sergeant St. Amour directed Sergeant Alex Nguyen to the area where he saw the man run. Sergeant Nguyen found the man inside a nearby house and took him into custody. The man was identified at trial as Byron Finister.

Officer Gutierrez and Detective Joseph saw another young male who matched the description of one of the suspects. The man was not wearing a shirt, was sweating, and appeared out of breath. Officer Gutierrez detained the man, who was identified at trial as [petitioner]. Detective Mata searched [petitioner] and found Solorio's cell phone in his pants pocket.

Detectives Mata and Joseph returned to the Fallingtree Drive residence to conduct the parole search. Detective Mata found a denim fishing hat in the garage of the residence. Detective Mata also found a police baton and Solorio's wallet. Detective Joseph found a box containing stereo wire with frayed ends and personal papers and letters. He found a blue backpack in the rafters of the garage that contained stereo wire similar to the other found, as well as a car CD player/radio, equalizer, and faceplate. Detective Joseph also found Solorio's driver's license, some wallet inserts, and pictures in the garage rafters.

Officer Aaron Guglielmelli examined Solorio's car on June 22, 2001. He did not notice any damage, marks, scratches, dents, or chips in the trunk area.

Detective Mata thereafter decided to conduct surveillance at a residence on Vista Glen Avenue in San Jose. Sergeant St. Amour and Detective Joseph searched the Vista Glen residence on June 22, 2001. They found White in the garage of the residence which had been converted into living quarters. White and Nathan Green were arrested there. Michelle Hermosillo, Green's mother, later met with Detective Mata. Hermosillo was aware that White kept property at her home, and told Mata that White's brother Jovarre[1] had come to her home and taken away some property. The property was in a bag, and she had no idea what it was. Mata recovered a gray fishing hat and a black bandanna from the garage.

Detective Mata returned to the Fallingtree Drive address, where he spoke to Jasmine W. And her father. On Monday, June 18, 2001, at about 2:30 a.m., Jasmine was at home with Finister and her boyfriend, Felix Taplin, when [petitioner] placed a multicolored blanket on the ground and that, when it opened it, it contained a PlayStation, CDs, and stereo equipment. She said that [petitioner] stated that he had just robbed somebody. She said that White spent the night and left early in the morning. She said that afternoon she saw [petitioner] washing a white car in her driveway. Detective Mata recovered Solorio's multicolored blanket from the garage. Jasmine denied at trial that she owned the multicolored blanket, and denied that she made any of the statements Mata reported she did. She testified that she was aware that Taplin was charged with possession of stolen property as a co-defendant in this case, but she was not aware that he had pleaded guilty.

Detective Mata determined that the incident took place in the general vicinity of the El Rancho Verde apartment complex, and that

---

[1] We will hereafter refer to White's family members by first name for ease of reference rather than from out of any disrespect. (Footnote renumbered.)

Order Denying Petition for a Writ of Habeas Corpus
P:\PRO-SE\SJ.JW\HC.06\Gadsden06408_denyHC.wpd          4

both defendants lived in the vicinity.  He searched the carport area of the complex, but found no weapons or casings, or any other evidence that a weapon had been discharged in the area.

Detective Mata requested that White's jail telephone calls be monitored.  On June 23, 2001, Mata received a copy of White's taped phone conversations with his mother, Cheryl. (footnote omitted) During the first conversation, White told his mother to "go clean my room up," and to tell Jovarre to "sell his speakers."  He asked his mother to "go in my room" and "anything you see that is not right then... pick it up" "[b]ecause... I think mike's... there."  "[T]hose things that are on the side of the couch too."  He said that "they [are] saying that we used a pellet gun," and responded "I don't know" when his mother asked him where the pellet gun was.  Cheryl told White that she knew "mike" and that she "[g]ot it," but that she did not see "the other thing."  White told her to take something "gray" that she had found.  She also got "things that you put in" "mike."  She told him that she took "long" but not what "long holds."  She could not find "an orange box that has little gold things in it."  Downstairs, she found "a blue and gray box, [that] has tools in it," and White told her to "[t]ell him to get those... things out of there... ASAP."  During the second conversation, Cheryl told [White] that she found "the orange case" and "[t]hat fake thing," and [White] told her to "get those all out of the house."

After listening to the tape, Detective Mata went to the White household.  He knocked on the door, and saw Jovarre go in and out of a window.  He was let inside after about 20 minutes.  Cheryl came inside the house through the rear door, and Mata met her in the kitchen/living room area.  He told her about her taped phone conversation with White.  She denied having had the conversations.  Mata saw Solorio's speaker box in the living room area, and asked her who owned it.  She said that she did not know.  She finally admitted to having the phone conversations with White.  She said that "long" was also know as "Mike," and was a rifle that was in her bedroom closet.  She said that she knew what "short" meant, and that she did not find it, but that she did find a pellet gun.  She said that had "silver," which was ammunition to "short."  She said that she had put "silver" in her car.  Detective Mata recovered the speaker box, a rifle from Cheryl's bedroom, and athletic jacket and two pairs of athletic gloves from White's bedroom, ammunition and a suede gun case from Jovarre's bedroom, and a pellet gun and an orange box of .22 ammunition from Cheryl's vehicle that was parked in the back of the residence.  He did not find a handgun that could match the suede gun case.

White testified in his own defense as follows.  Prior to his arrest, he had been living in the garage area of Green's home.  He had not lived with his mother for about six months.  Half of his things were at his mother's, half were at Green's.

On the night of June 17, 2001, White borrowed his friend Fernando's Mazda and went with Green to pick up his friend Samuel.  They ran into [petitioner] when they were leaving Samuel's place.  [Petitioner] asked if he could go with them.  The four of them then went downtown.  They parked in a parking lot by Club Tropicana because that is where Fernando was showing off a car he had just bought from Green.  A lot of other people were there.  Fernando started playing with the hydraulics on his new car while White and Green talked to some girls.

    After about 45 minutes, Fernando's girlfriend called, wanting him home. Fernando told White that he wanted to the Mazda. Green offered to drive the hydraulic car and got into the car. White went over and told [petitioner] that they were leaving. [Petitioner] was in the front passenger seat of a white car playing with a PlayStation and Solorio was in the driver's seat. Solorio asked, "Do you guys know where to get some ecstacy?" [Petitioner] said, "Yeah."

    A police officer drove up and told everybody to leave. White went back to the Mazda but [petitioner] stayed in Solorio's car. After the officer left, White went back to [petitioner]. [Petitioner] said that he was going with Solorio. White decided to go with them, and got in behind Solorio. [Petitioner] gave Solorio directions to the El Rancho Verde apartments. When they arrived [petitioner] was still playing with the PlayStation, and asked White to see if "Jesse" was home. White went to Jesse's apartment and saw that his upstairs bedroom light was off. White threw rocks at Jesse's bedroom window but nobody responded. When he returned to the car Solorio and [petitioner] had switched seats, the car's trunk was open, and speakers were in a shopping cart. [Petitioner] was "messing with something in the front," and White asked him what he was doing. Solorio looked frightened. [Petitioner] and Solorio got out of the car, and White started arguing with [petitioner]. Solorio stood there for a while, until White looked over at him and said, "Man, you're stupid." Solorio then ran.

    [Petitioner] got into the car and drove off, leaving the shopping cart containing the speakers. White heard no gunshots. He started to walk away, but then decided to take the speakers. He took them to his mother's house, which was near by. It was then that he noticed that his cell phone was missing. He started calling his cell phone number and finally, after "a long, long time," [Petitioner] answered it. White said, "'Whatever you do is on you. Just give me my phone.'" [Petitioner] hung up on him. White wanted his phone, so he called Green and the two of them went looking for [petitioner]. When they did not find him, they went back to Green's house. White found [petitioner] the next afternoon, and got his cell phone back. He did not call the police because he did not want to be involved; there was also a warrant out for his arrest.

    White was arrested at Nathan Green's on June 22. He denied to Detectives Mata and Joseph that he knew anything about what happened on June 17 and 18. He called his mother from the jail and talked to her in code because he knew that the call was monitored. He wanted everything out of the house because he knew the police were going to search it. He did not use a gun on Solorio, but he did not want any weapons found because he did not want the police "to get the wrong impression."

(Resp. Ex. 8 at 2-10.)

## DISCUSSION

A.  Standard of Review

    This court may entertain a petition for a writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that

he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).

The writ may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." Id. § 2254(d).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." Williams v. Taylor, 529 U.S. 362, 412-13 (2000). "Under the 'reasonable application clause,' a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. at 413. "[A] federal habeas court may not issue the writ simply because the court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411. A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." Id. at 409.

The only definitive source of clearly established federal law under 28 U.S.C. § 2254(d) is in the holdings (as opposed to the dicta) of the Supreme Court as of the time of the state court decision. Williams, 529 U.S. at 412; Clark v. Murphy, 331 F.3d 1062, 1069 (9th Cir. 2003). While circuit law may be "persuasive authority" for purposes of determining whether a state court decision is an unreasonable

application of Supreme Court precedent, only the Supreme Court's holdings are binding on the state courts and only those holdings need be "reasonably" applied. Id.

Even if the state court decision was either contrary to or an unreasonable application of clearly established federal law, within the meaning of AEDPA, habeas relief is still only warranted if the constitutional error at issue had a "'substantial and injurious effect or influence in determining the jury's verdict.'" Penry v. Johnson, 532 U.S. 782, 796 (2001) (quoting Brecht v. Abrahamson, 507 U.S. 619, 638 (1993)).

Lastly, a federal habeas court may grant the writ it if concludes that the state court's adjudication of the claim "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). The court must presume correct any determination of a factual issue made by a state court unless the petitioner rebuts the presumption of correctness by clear and convincing evidence. 28 U.S.C. §2254(e)(1).

B.  Legal Claims and Analysis

Petitioner raises four claims for federal habeas relief: (1) the exclusion of impeachment evidence violated his rights under the Confrontation Clause; (2) he received ineffective assistance of appellate counsel, in violation of his right to due process; (3) the prosecutor committed misconduct, in violation of petitioner's right to due process; and (4) there was insufficient evidence to support the kidnapping for robbery conviction, in violation of petitioner's right to due process.

1.  Confrontation Clause

The Confrontation Clause of the Sixth Amendment provides that in criminal cases the accused has the right to "be confronted with witnesses against him." U.S. Const. amend. VI. The federal confrontation right applies to the states through the Fourteenth Amendment. See Pointer v. Texas, 380 U.S. 400, 403 (1965).

1　　　　The ultimate goal of the Confrontation Clause is to ensure reliability of
2  evidence, but it is a procedural rather than a substantive guarantee.  Crawford v.
3  Washington, 541 U.S. 36, 61 (2004).  It commands, not that evidence be reliable, but
4  that reliability be assessed in a particular manner: by testing in the crucible of cross-
5  examination.  Id.; see Davis v. Alaska, 415 U.S. 308, 315-16 (1974) (a primary
6  interest secured by the Confrontation Clause is the right of cross-examination).  The
7  Clause thus reflects a judgment, not only about the desirability of reliable evidence,
8  but about how reliability can best be determined.  Crawford, 541 U.S. at 61; see,
9  e.g., United States v. Medjuck, 156 F.3d 916, 919 n.1 (9th Cir. 1998) (Confrontation
10  Clause serves purposes of  ensuring that witnesses will testify under oath, forcing
11  witnesses to undergo cross-examination, and permitting the jury to observe the
12  demeanor of witnesses.); Wood v. Alaska, 957 F.2d 1544, 1549 (9th Cir. 1992) (the
13  right to confrontation includes the right to cross examine adverse witnesses and to
14  present relevant evidence).
15　　　　The Confrontation Clause does not prevent a trial judge from imposing
16  reasonable limits on cross-examination based on concerns of harassment, prejudice,
17  confusion of issues, witness safety or interrogation that is repetitive or only
18  marginally relevant.  Delaware v. Van Arsdall, 475 U.S. 673, 679 (1986).  The
19  Confrontation Clause guarantees an opportunity for effective cross examination, not
20  cross examination that is effective in whatever way, and to whatever extent, the
21  defense might wish.  See Delaware v. Fensterer, 474 U.S. 15, 20 (1985) (per
22  curiam).  A defendant meets his burden of showing a Confrontation Clause violation
23  by showing that "[a] reasonable jury might have received a significantly different
24  impression of [a witness'] credibility . . . had counsel been permitted to pursue his
25  proposed line of cross-examination."  Van Arsdall, 475 U.S. at 680; Slovik v. Yates,
26  No. 06-55867, slip op. 1513, 1524 (9th Cir. Feb. 10, 2009).
27　　　　To determine whether a criminal defendant's Sixth Amendment right of
28  confrontation has been violated by the exclusion of evidence on cross-examination,

a court must inquire whether: "(1) the evidence was relevant; (2) there were other legitimate interests outweighing the defendant's interests in presenting the evidence; and (3) the exclusion of evidence left the jury with sufficient information to assess the credibility of the witness." United States v. Beardslee, 197 F.3d 378, 383 (9th Cir. 1999) (citations omitted); see, e.g., Plascencia v. Alameda, 467 F.3d 1190, 1201 (9th Cir. 2006) (exclusion of cross-examination that would have provided cumulative or repetitive evidence did not violate Confrontation Clause or was harmless error); United States v. Brown, 347 F.3d 1095, 1098-99 (9th Cir. 2003) (finding no Confrontation Clause violation in district court's quashing defense subpoena for informant's immigration file and refusing to allow defense to call two proposed expert witnesses concerning INS regulations and practices where thorough cross-examination of informant enabled jury to sufficiently assess informant's credibility); Evans v. Lewis, 855 F.2d 631, 633-34 (9th Cir. 1988) (no violation of Confrontation Clause where trial court restricted cross examination of prosecution witness whose bias and motivation had been clearly established and evidence sought to be introduced only cumulative on issue of credibility); Bright v. Shimoda, 819 F.2d 227, 229-30 (9th Cir. 1987) (no constitutional violation where substantial cross examination permitted and excluded evidence was of collateral nature), cert. denied, 485 U.S. 970 (1988).

Petitioner claims that the exclusion of impeachment evidence against the victim Solorio violated his rights under the Confrontation Clause. Specifically, petitioner wanted to use evidence that Solorio had an October 2001 misdemeanor conviction for having sexual intercourse with a minor more than three years younger than him to attack Solorio's credibility as a witness. (Resp. Ex. 8 at 10.) The prosecutor moved in limine to exclude the evidence under California Evidence Code § 352, arguing that the evidence would result in substantial prejudice and that proving the underlying conduct would result in an undue consumption of time. (Id.) The trial court disagreed that it would involve an undue consumption of time, but

felt that the probative value of the evidence was "outweighed by its undue prejudice 'given the nature of the conviction to the witness and potential for confusing the issues.'" (Id. at 10-11.) Defense counsel was permitted to revisit the issue after Solorio testified, but the court declined to change its ruling. (Id. at 11.)

In upholding the trial court's ruling, the California Court of Appeal found that there was no violation of the Confrontation Clause:

> A trial court may restrict cross-examination of an adverse witness pursuant to Evidence Code section 352 despite the strictures of the confrontation clause. (citation omitted.) "[T]he ordinary rules of evidence do not infringe on a defendant's right to present a defense. [Citation.] Trial courts possess the 'traditional and intrinsic power to exercise discretion to control the admission of evidence in the interests of orderly procedure and the avoidance of prejudice.' [Citation.]" (citation omitted.) A trial court's limitation on cross-examination regarding the credibility of a witness does not violate the confrontation clause unless a reasonable jury might have received a significantly different impression of the witness's credibility had the excluded cross-examination been permitted. (citation omitted.)
> In this case, Solorio was repeatedly confronted with contradictions between his trial testimony and prior statements, and his credibility was extensively impeached. Solorio admitted that he had told different stories when he first reported the robbery the night it occurred, when he talked to Detective Mata on June 19, 2001, when he testified at the preliminary hearing, and when he testified at trial. For instance, at the preliminary hearing and at trial, Solorio testified that he was inside his car when defendants came up and asked about the stereo, but in his first statement to police he said that [petitioner] pointed a gun at him and ordered him into the car. In his statement to Detective Mata he said that [petitioner] asked him for a cigarette, White entered the rear passenger seat of the car and pointed a gun at him, and [petitioner] ordered him into the car because "We're going for a ride." At trial Solorio testified that White was in the front seat and did not pull a gun until after the officer entered and left the parking lot. At the preliminary hearing Solorio testified that White had a pocket knife that he used to poke Solorio in the stomach, but at trial he admitted that he had never mentioned a knife to police. In his statement to police Solorio said that he switched seats with White at a 7-11 store and that White drove to the apartment complex, while at trial Solorio testified that he himself drove to the apartment complex. Even if the trial court erred in failing to allow [Solorio] to be cross-examined regarding his prior misdemeanor conduct, a reasonable jury would not have received a significantly different impression of Solorio's credibility. Thus, there was no confrontation clause violation...

(Id. at 13-14.)

A review of the record indicates that Solorio appeared at trial and was made

1  available for cross-examination. The record also shows, as described by the state
2  appellate court, that Solorio was subjected to a thorough cross-examination which
3  highlighted his contradictory statements and impeached his credibility. Even if the
4  evidence was relevant, there were other legitimate interests outweighing petitioner's
5  interests in presenting the evidence and the exclusion of evidence left the jury with
6  sufficient information to assess the credibility of the witness. See Beardslee, 197
7  F.3d at 383. The state court was not unreasonable in its determination that a
8  reasonable jury would not have received a significantly different impression of
9  Solorio's credibility had the excluded impeachment evidence been admitted. See
10 Van Arsdall, 475 U.S. at 680. Because the Confrontation Clause only guarantees an
11 opportunity for effective cross- examination, the fact that impeachment evidence
12 was excluded does not implicate a violation of the Confrontation Clause. See
13 Fensterer, 474 U.S. at 20.
14      Accordingly, the Court concludes that the state court's decision rejecting this
15 claim was not contrary to, or an unreasonable application of clearly established
16 federal law, nor was it an unreasonable determination of the facts in light of the
17 evidence presented. 28 U.S.C. 2254(d)(1), (2). Petitioner is not entitled to habeas
18 relief on this claim.
19      2.      Ineffective Assistance of Appellate Counsel
20      The Due Process Clause of the Fourteenth Amendment guarantees a criminal
21 defendant the effective assistance of counsel on his first appeal. Evitts v. Lucey, 469
22 U.S. 387 (1985). In evaluating such a claim, the federal court applies the standard
23 set forth in Strickland v. Washington, 466 U.S. 668 (1984). Smith v. Robbins, 528
24 U.S. 259, 285 (2000). A defendant therefore must show that counsel's advice fell
25 below an objective standard of reasonableness and that there is a reasonable
26 probability that, but for counsel's unprofessional errors, he would have prevailed on
27 appeal. Miller v. Keeney, 882 F.2d 1428, 1434 & n.9 (9th Cir. 1989).
28      Petitioner alleges that appellate counsel rendered ineffective assistance with

1 respect to two claims in petitioner's direct appeal.  First, petitioner asserts that
2 counsel failed to sufficiently argue that petitioner was prejudiced by Solorio's prior
3 conviction as impeachment evidence.  It appears from petitioner's direct appeal that
4 appellate counsel did indeed raise and fully brief this issue.  (Resp't Ex. 3 at 36-49.)
5 Petitioner fails to specifically show how appellate counsel was deficient in doing so,
6 *e.g.*, by offering any additional arguments to support this claim that would have been
7 successful on appeal.  Furthermore, the Court has determined that this Confrontation
8 Clause claim is without merit as discussed above.  See *supra* at 12.  Secondly,
9 petitioner claims appellate counsel should have argued that there was insufficient
10 evidence of the element of force for kidnapping for robbery because the jury found
11 not true that petitioner personally discharged a handgun.  However, this claim was
12 rejected by the state courts on habeas review, (see Resp't Ex. 12 at 3), and petitioner
13 has made no showing that there is a "reasonable probability" of a different result had
14 the claim been raised on direct appeal.  Strickland, 466 U.S. at 694.  An appellate
15 lawyer's failure to raise a meritless claim is neither unreasonable nor prejudicial.
16 See Miller v. Keeney, 882 F.2d at 1434 (noting that one of "hallmarks of effective
17 appellate advocacy" is weeding out weaker issues); see also Jones v. Barnes, 463
18 U.S. 745, 751 (1983) (holding appellate counsel has no duty to raise every
19 nonfrivolous claim requested by appellant).  Consequently, petitioner did not receive
20 ineffective assistance of appellate counsel nor was he prejudiced by the manner in
21 which his appeal was conducted.  Accordingly, petitioner is not entitled to habeas
22 relief on this claim.

23        3.     Prosecutorial Misconduct

24     Petitioner claims that the prosecutor engaged in misconduct by his "deceptive
25 rebuttal technique" whereby Detective Mata was allowed to remain in the courtroom
26 as the investigating officer and then was called to offer "his own prior police
27 interview hearsay" or "argumentative impeachment."  (Pet. 9-11.)
28     The superior court found that petitioner failed to show that any objection was

1    raised during trial on this issue or to point out "any specific parts of the record both
2    to show that the detective was present during the testimony of others and how that
3    worked to his advantage in his own testimony." (Resp't Ex. 12 at 2.)  Respondent
4    contends that, therefore, this claim was procedurally defaulted.

5    A federal court will not review questions of federal law decided by a state
6    court if the decision also rests on a state law ground that is independent of the
7    federal question and adequate to support the judgment. Coleman v. Thompson, 501
8    U.S. 722, 729-30 (1991).  In cases in which a state prisoner has defaulted his federal
9    claims in state court pursuant to an independent and adequate state procedural rule,
10   federal habeas review of the claims is barred unless the prisoner can demonstrate
11   cause for the default and actual prejudice as a result of the alleged violation of
12   federal law, or demonstrate that failure to consider the claims will result in a
13   fundamental miscarriage of justice. Id. at 750.  Where the state court decision rests
14   on clearly alternate grounds, one invoking a state procedural bar and the other
15   addressing the merits, the state procedural ground may still be sufficiently
16   independent to preclude habeas review.  See Bargas v. Burns, 179 F.3d 1207, 1214
17   (9th Cir. 1999).

18   Here, the decision of the state superior rested on clearly alternate state
19   procedural grounds.  The state court rejected petitioner's claim because he failed to
20   object to Detective Mata remaining in the courtroom during trial; this failure to
21   object at trial constituted a waiver. (Resp't Ex. 12 at 2.)  The court also rejected the
22   claim on the merits, holding that petitioner failed to show in the record that
23   Detective Mata was present during the testimony of others and how that worked to
24   Detective Mata's advantage during his testimony.  (Id.)  Even though the state
25   superior court considered the merits, the state procedural bar imposed is sufficiently
26   independent to preclude habeas review.  The Ninth Circuit has recognized and
27   applied the California contemporaneous objection rule in affirming denial of a
28   federal petition on grounds of procedural default where there was a complete failure

Order Denying Petition for a Writ of Habeas Corpus
P:\PRO-SE\SJ.JW\HC.06\Gadsden06408_denyHC.wpd        14

to object at trial.  See Inthavong v. Lamarque, 420 F.3d 1055, 1058 (9th Cir. 2005); Paulino v. Castro, 371 F.3d 1083, 1092-93 (9th Cir. 2004); Vansickel v. White, 166 F.3d 953, 957-58 (9th Cir. 1999).  Accordingly, the state superior court's rejection of this claim for failure to object at trial is a procedural bar that will be honored by this Court.

### 4. Insufficient Evidence

Petitioner's last claim is that due process was violated because there was insufficient evidence to support the kidnapping for robbery conviction.  Specifically, petitioner claims that because the jury acquitted him of the gun enhancement allegations, it negated the element of force or threat of force for the kidnapping charge.  (Pet. 13.)

The Due Process Clause "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged."  In re Winship, 397 U.S. 358, 364 (1970).  A state prisoner who alleges that the evidence in support of his state conviction cannot be fairly characterized as sufficient to have led a rational trier of fact to find guilt beyond a reasonable doubt therefore states a constitutional claim, see Jackson v. Virginia, 443 U.S. 307, 321 (1979), which, if proven, entitles him to federal habeas relief, see id. at 324.

A federal court reviewing collaterally a state court conviction does not determine whether it is satisfied that the evidence established guilt beyond a reasonable doubt.  Payne v. Borg, 982 F.2d 335, 338 (9th Cir. 1992).  The federal court "determines only whether, 'after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'"  See id. (quoting Jackson, 443 U.S. at 319).  Only if no rational trier of fact could have found proof of guilt beyond a reasonable doubt, may the writ be granted.  See Jackson, 443 U.S. at 324; Brown, 525 F.3d at 794; Payne, 982 F.2d at 338; Miller v. Stagner, 757 F.2d 988, 992-93

1  (9th Cir.), amended, 768 F.2d 1090 (9th Cir. 1985).

2  On habeas review, a federal court evaluating the evidence under In re Winship and Jackson v. Virginia should take into consideration all of the evidence presented at trial. LaMere v. Slaughter, 458 F.3d 878, 882 (9th Cir. 2006) (in a case where both sides have presented evidence, a habeas court need not confine its analysis to evidence presented by the state in its case-in-chief). If confronted by a record that supports conflicting inferences, a federal habeas court "must presume – even if it does not affirmatively appear on the record – that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." Jackson, 443 U.S. at 326. A jury's credibility determinations are therefore entitled to near-total deference. Bruce v. Terhune, 376 F.3d 950, 957 (9th Cir. 2004). Except in the most exceptional of circumstances, Jackson does not permit a federal habeas court to revisit credibility determinations. See id. (credibility contest between victim alleging sexual molestation and defendant vehemently denying allegations of wrongdoing not a basis for revisiting jury's obvious credibility determination); see also People of the Territory of Guam v. McGravey, 14 F.3d 1344, 1346-47 (9th Cir. 1994) (upholding conviction for sexual molestation based entirely on uncorroborated testimony of victim).

The state court rejected this claim, finding that "the jury did also convict [petitioner] of second degree robbery and carjacking, both of which require a 'force or fear' element." (Id.) Furthermore, the state court found that "the evidence indicated that [p]etitioner may have wielded a knife and that a pellet gun may have been used in lieu of an actual firearm [footnote omitted]." (Id.) The state court concluded that "there was sufficient evidence from which the jury could conclude that the kidnapping for robbery was carried out with the threat or use of force, albeit without the use of a firearm." (Id.)

According to the jury instructions given for the charge of kidnapping to commit robbery, there were five elements that needed to be proved beyond a

reasonable doubt: 1) "a person was [unlawfully] moved by the use of physical force" or "compelled to move because of a reasonable apprehension of harm"; 2) "[t]he movement of that person was caused with the specific intent to commit [robbery], and the person causing the movement had the required specific intent when the movement commenced"; 3) "[t]he movement of the person was without that person's consent"; 4)"[t]he movement of the person was for a substantial distance, that is, a distance more than slight, brief or trivial"; and 5)" [t]he movement substantially increased the risk of harm to the person moved, over and above that necessarily present in the crime of [robbery] itself." (Resp't Ex. 1 at 473-74.) The elements do not include a specific requirement that the force used to move or compel the victim to move be achieved through the use of a firearm. The evidence shows that the victim Solorio was afraid of harm when he was forced to drive away from the parking lot at gunpoint. See *supra* at 2. A rational trier of fact could have found that the victim Solorio was "compelled to move because of a reasonable apprehension of harm," (Resp't Ex. 1 at 473), which satisfies the force element for kidnapping. See Payne, 982 F.2d at 338. Accordingly, the state court's rejection of this claim was not contrary to, or an unreasonable application of clearly established federal law, nor was it an unreasonable determination of the facts in light of the evidence presented. 28 U.S.C. 2254(d)(1), (2). Petitioner is not entitled to habeas relief on this claim.

## CONCLUSION

For the foregoing reasons, the petition for a writ of habeas corpus is DENIED.

DATED: May 20, 2009

JAMES WARE
United States District Judge

Order Denying Petition for a Writ of Habeas Corpus
P:\PRO-SE\SJ.JW\HC.06\Gadsden06408_denyHC.wpd      17

UNITED STATES DISTRICT COURT

FOR THE

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNUSSUN GADSDEN,<br><br>　　　　　Petitioner,<br><br>　v.<br><br>D.K. SISTO, Warden,<br><br>　　　　　Respondent.<br>　　　　　　　　　　　　　　　　　／ | Case Number: CV06-06408 JW<br><br>**CERTIFICATE OF SERVICE** |

I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District Court, Northern District of California.

That on  5/28/2009  , I SERVED a true and correct copy(ies) of the attached, by placing said copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said envelope in the U.S. Mail, or by placing said copy(ies) into an inter-office delivery receptacle located in the Clerk's office.

Unussun Gadsden T-73598
Solano State Prison
Vacaville, Ca 95696-4000

Dated:　  5/28/2009  

　　　　　　　　　　　　　　　　　　　　Richard W. Wieking, Clerk
　　　　　　　　　　　　　　　　　/s/ By: Elizabeth Garcia, Deputy Clerk